**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TAMMY TAYNOR, | ) | |
| | ) | CASE NO. 5:13CV1643 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Tammy Taynor ("Taynor") challenges the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying her claim for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i) & 423 *et seq.*  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is AFFIRMED.

**I.  Procedural History**

On December 18, 2009, Taynor filed an application for POD and DIB alleging a disability onset date of August 17, 2008 and claiming she was disabled due to herniated disc, bulging disc, anxiety/depression, lumbar sprain/strain, high blood pressure, acid reflux disease, mitra valve prolapse, and, diverticulitis.  (Tr. 132, 138.)  Her application was denied both

initially and upon reconsideration.  (Tr.  76- 79, 81- 83.)  Taynor timely requested an

administrative hearing.

On November 15, 2011, an Administrative Law Judge ("ALJ") held a hearing during

which Taynor, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr.

33-73.)  On December 9, 2011, the ALJ found Taynor was able to perform a significant number

of jobs in the national economy and, therefore, not disabled.  (Tr. 14-26.)  The ALJ's decision

became final when the Appeals Council denied further review.  (Tr. 1-4.)

## II.  Evidence

*Personal and Vocational Evidence*

Age forty-six (46) at the time of her administrative hearing, Taynor is a "younger" person

under social security regulations.  *See* 20 C.F.R. § 404.1563(c) & 416.963(c).  She has a high

school education and past relevant work as a record clerk, flagger, hand packager, stocker, and

nurse's aide.  (Tr. 36, 63-65.)

*Relevant Medical Evidence*[1]

In November 2005, Taynor injured her back while working as a nurse's aide.  (Tr. 458.)

She underwent an MRI of her lumbar spine in May 2007, which showed a disc herniation at L2-

L3 indenting the thecal sac near the L3 nerve root and mild disc bulging at L4-L5 with

indentation of the thecal sac.  (Tr. 210-212.)  Taynor took several weeks off, and then returned to

work.  (Tr. 458.)

In April 2008, Taynor began treatment with Harsh Govil, M.D.  (Tr. 248-251.)  She

---

[1]  As it is not necessary for resolution of the instant case, this Opinion will not recount the
medical evidence regarding Taynor's mental impairments, asthma, COPD, hypertension,
diverticulitis, or gastrointestinal reflux disease.

2

reported lower back pain radiating into her lower extremities, and listed her aggravating factors as "lying down, bending forward, bending backwards, all overhead activities, lifting, sitting for 30 minutes, and walking for 35 minutes."  (Tr. 248.)  On physical examination, Dr. Govil noted moderate tenderness in the paraspinous muscles at L3, L4, and L5; mild muscle spasms; and, positive straight leg raising on the left.  (Tr. 249-250.)  He prescribed pain medication and recommended a series of epidural steroid injections in Taynor's lumbar spine at the L2-L3 level.  (Tr. 249-250.)  Taynor underwent the injections in May, June and July 2008.  (Tr. 255, 262, 266.)   Taynor continued to work until August 2008, when she experienced exacerbation of her back pain.  (Tr. 272.)  In September 2008, she underwent another MRI of her lumbar spine, which showed (1) a small broad based left paracentral disc herniation at L2-L3 coming in contact with the left L3 nerve root in the lateral recess; and, (2) minimal annular disc bulging at L4-L5.  (Tr. 365.)   Dr. Govil referred Taynor to a "Dr. Coggins" for surgical evaluation.  (Tr. 272.)

In October 2008, Taynor reported that Dr. Coggins concluded she was not a candidate for surgery.  (Tr. 276.)  Dr. Govil prescribed another series of epidural steroid injections, which Taynor underwent in December 2008, January 2009, and February 2009.  (Tr. 284 -286, 295-297, 299-302, 307.)  Dr. Govil also ordered an EMG/nerve conduction study.  (Tr. 282.)  This study, performed on January 2, 2009, showed no evidence of lumbosacral radiculopathy on the left side.  (Tr. 370.)

In December 2008, Taynor reported to Dr. Govil that she had fallen at home and hurt her right arm.  (Tr. 288.)  Dr. Govil referred her to Gregory Hill, D.O. for evaluation.  (Tr. 288.)  Dr. Hill ordered an x-ray, which showed a type 2 acromion with some mild separation of the

acromioclavicular joint.  (Tr. 290.)  In February 2009, Taynor underwent an MRI of her right shoulder, which showed a probable partial-thickness intrasubstance/undersurface tear in the anterior aspect of the distal suprasinatus.  (Tr. 364.)  Taynor underwent rotator cuff surgery on her right shoulder on June 5, 2009.  (Tr. 320, 785.)

Meanwhile, in April 2009, Taynor reported worsening back pain after being in a car accident.  (Tr. 310-311.)  Dr. Govil recommended another series of epidural steroid injections due to "increased radicular pain in the left lower extremity in L4 distribution."  (Tr. 314.) Taynor underwent the injections in May, July, and August 2009.  (Tr. 316-319, 324-327, 332-325.)  She also began using a TENS unit, which provided some relief.  (Tr. 312, 327, 331, 335, 336.)

In September 2009, Taynor presented to Dr. Govil with complaints of continued significant pain.  (Tr. 339.)  Dr. Govil referred Taynor to Dr. Coggins for another surgical evaluation.  (Tr. 339.)  Dr. Coggins recommended against surgery and suggested Taynor undergo a lumbar myelogram with a follow up CT.  (Tr. 350.)  A CT myelogram of the lumbar spine was conducted in January 2010 and showed (1) multilevel degenerative disc disease greater at L2-L3 with a mild to moderate disc bulge; and, (2) mild central disc protusions at L3-L4 and L4-L5. (Tr. 873.)  Dr. Coggins recommended Taynor try Lyrica and consider chiropractic or acupuncture treatment, as well as regular exercise and fitness.  (Tr. 354.)  Dr. Govil scheduled Taynor for another series of epidural steroid injections, which she underwent in March, April and May 2010.  (Tr. 354, 360, 516-519, 524-527.)

On March 18, 2010, Paul Martin, M.D., performed an occupational medicine consultation for Workers Compensation.  (Tr. 458-462.)  He concluded Taynor was "physically capable of

4

working in a modified work environment which would be considered sedentary in nature," i.e. "lifting up to 10 pounds, avoidance of frequent or repetitive bending, twisting or stooping activities, alternate sitting and standing activities to avoid prolonged periods in any one position and also avoiding utilizing the right arm above the level of her shoulder for prolonged periods of time." (Tr. 461.)  The following month, Dr. Govil opined Taynor could perform "sedentary work only; no lifting over 10 pounds."  (Tr. 243-244.)

On March 19, 2010, Taynor's primary care physician, Scott D. Williams, M.D., completed a medical source statement.  (Tr. 470-472.)  Therein, Dr. Williams noted Taynor "has a history of disc herniations at L2-L3, disc bulging L4-L5 causing back pain on walking, sitting, bending, pulling, etc." (Tr. 471.)  He stated Taynor "has had only so-so response to . . . pharmacological therapy" and concluded her "back pain inhibits . . .  sitting/standing/walking." (Tr. 472.)

On April 22, 2010, state agency physician Anton Freihofner, M.D., reviewed Taynor's medical records and concluded she was capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently; standing and/or walking about 6 hours in an 8 hour workday; and, sitting about 6 hours in an 8 hour workday.  (Tr. 479-486.)   He also offered that she had unlimited push/pull capacity; could occasionally stoop, kneel, crouch, and crawl but never climb ladders, ropes, and scaffolds; and, should avoid hazardous machinery and unprotected heights. (Tr. 480-483.)

In June 2010, Dr. Govil advised Taynor that he was relocating and would be referring her to Jamesetta Lewis, M.D.  (Tr. 694.)  Taynor presented to Dr. Lewis for initial evaluation on July 23, 2010.  (Tr. 755-758.)  Taynor reported her pain was "constant and sharp," and accompanied

5

by numbness and "pins and needles sensation" radiating down her left side.  (Tr. 756.)  She

stated "her pain is worse with any type of activity including walking, bending, and twisting."

(Tr. 756.)  Upon examination, Dr. Lewis noted Taynor arose from a seated to standing position

with no difficulty, but observed "[s]he does have an antalgic gait, bears much of the weight on

her right leg." (Tr. 757.)  Dr. Lewis also noted decreased straight leg range of motion; increased

tenderness along the lumbar midline and paraspinal musculature at L4-L5 and L5-S1; positive

left hip pain; left sacroiliac joint tenderness; positive straight leg raise on the left; and, negative

Waddell sign throughout the examination. (Tr. 757.)  Dr. Lewis' "overall impression" was that

Taynor suffered from (1) chronic lower back pain with left lower extremity radiculopathy

secondary to lumbar disc bulge at L2-L3, L3-L4, and L4-5/lumbar degenerative disc

disease/bilateral neural foraminal narrowing/lumbar facet arthropathy; (2) left sacroiliac joint

dysfunction; (3) myofascial pain syndrome; (4) degenerative joint disease; and, (5) history of

right shoulder partial-thickness intrasubstance/undersurface tear. (Tr. 757-758.)  Dr. Lewis

prescribed Vicodin, Lyrica, and Flexeril, and recommended consideration of a spinal cord

stimulator. (Tr. 758.)

     Taynor returned to Dr. Lewis and/or her associates at the Affinity Medical Center in

August and October 2010, and on at least six occasions in 2011.[2]  Examinations during 2010

---

[2]The records before the ALJ include treatment notes from Dr. Lewis and/or her associates reflecting visits in January, April, June, August, and September 2011.  (Tr. 859-860, 801-802, 819-820, 844-847, 842-843, 889-892.)  Taynor submitted additional records to the Appeals Council, including treatment notes from Dr. Lewis from October and November 2011.  (Tr. 1-6, 912-913, 935-936.)  As the Appeals Council denied review, this Court's review is limited to the record and evidence before the ALJ. See Foster v. Halter, 279 F.3d 348, 357 (6th Cir. 2001); Cline v. Comm'r of Soc. Sec., 96 F.3d 146, 148 (6th Cir. 1996); Cotton v. Sullivan, 2 F.3d 692, 696 (6th Cir. 1993); Walker v. Barnhart, 258 F.Supp.2d 693, 697 (E.D. Mich 2003).  Thus, the Court will not consider this additional medical evidence.

showed tenderness to palpation in the lumbar region; muscle spasms; trigger points; and, positive straight leg testing.  (Tr. 762-763, 867-868.)  In October 2010, a lumbar support brace was ordered "to help with patient's pain when she is on her feet for longer periods of time."  (Tr. 868.)  Between January and September 2011, Taynor variously rated her pain between a 3 and 8 on a scale of 10.  (Tr. 859, 801, 819, 842, 889.)  Examinations during this time period showed no antalgic gait but did reveal tenderness to palpation in the lumbar region; muscle spasms; trigger points; decreased range of motion in the right arm; and, positive straight leg raising. (Tr. 859, 801, 819- 820, 846, 842, 889-890.)

In December 2010, Taynor presented to John Riester, M.D., for evaluation of her right shoulder pain.  (Tr. 785-787.)  She rated her pain as an 8 on a scale of 10, and stated that it, "along with numbness and tingling, radiates down the entire right upper extremity."  (Tr. 785.)  Dr. Riester ordered an MRI, which Taynor underwent on January 11, 2011.  (Tr. 787, 812.)  This MRI was limited due to patient motion, but suggested a partial tear or dislocation; supraspinatus tendinopathy; possible mild partial intrasubstance tearing distal tendon at the greater tuberosity; and, possible degenerative changes anterior labrum.  (Tr. 812.)

On August 5, 2011, Dr. Williams completed a Basic Medical Form for the Department of Job and Family Services.  (Tr. 833-834.)  Therein, he opined Taynor was limited to standing/walking for 1 hour without interruption and for a total of 4 hours in an 8 hour workday; sitting for 1-2 hours without interruption and for a total of 6 hours in an 8 hour workday; and, lifting/carrying no more than 10 pounds (either occasionally or frequently).  (Tr. 834.)  He further concluded Taynor was markedly limited in pushing/pulling and bending; and, moderately limited in her abilities to reach, handle, and engage in repetitive foot movements.  (Tr. 834.)  He

described her health status as "good/stable with [treatment]." (Tr. 833.)

On September 21, 2011, Taynor presented to Dr. Lewis with complaints of right shoulder pain, rating her pain a 4 on a scale of 10.  (Tr. 889-890.)  On examination, Dr. Lewis noted Taynor "does not have antalgic gait and does not require assistance with ambulation." (Tr. 889.) She noted positive straight leg raising; tenderness along the lumbar midline with palpation; diminished range of motion with her right arm; and positive right shoulder impingement sign. (Tr. 890.)  Dr. Lewis continued Taynor on her medications and ordered an MRI of the right shoulder.  (Tr. 890.)  Dr. Lewis also stated "[i]n terms of her functionality assessment worksheet, the pain does not interfere with [Taynor's] general activity, mood, walking ability, normal work, relations with other people, sleep patterns, and overall enjoyment of life." (Tr. 889.)  In October 2011, Taynor underwent another MRI of her right shoulder, which showed a full thickness tear of mid and posterior supraspinatus tendon; and, mild acromio-clavicular joint arthritis.  (Tr. 905.)

In October 2011, Dr. Williams completed a Physical RFC assessment.  (Tr. 838-840.) Therein, he offered that Taynor could lift and carry no more than 10 pounds (either occasionally or frequently); stand/walk for less than 2 hours in an eight hour workday; and, sit for about 2 hours in an eight hour workday.  (Tr. 838.)  He found Taynor could stand for 5 minutes and sit for 15 minutes before needing to change position, and that she would need to walk around every 5 minutes for 5 minutes.  (Tr. 838-839.)  Dr. Williams also concluded Taynor would need the opportunity to shift at will from sitting or standing/walking and, further, that she would need to lie down at least once every day at an unpredictable interval during a work shift.  *Id.*  In addition, Dr. Williams indicated Taynor could never twist, stoop (bend), crouch, or climb stairs/ladders.

*Id.*  He also stated Taynor's reaching (including overhead), handling and pushing/pulling was affected by her impairments, and that she  would need to avoid concentrated exposure to both extreme cold and extreme heat.  (Tr. 839-840.)  Finally, Dr. Williams opined Taynor's impairments or treatment would cause her to miss work more than four days per month.  (Tr. 840.)  Dr. Williams opined these limitations applied since August 2008.  *Id.*

Dr. Lewis submitted a Physical RFC assessment on November 7, 2011.  (Tr. 907-909.) She concluded Taynor could lift and carry less than 10 pounds (either occasionally or frequently); stand/walk for less than 2 hours in an eight hour workday; and, sit for less than 2 hours in an eight hour workday.  (Tr. 907.)   Dr. Lewis also found Taynor could stand for 10 minutes and sit for 10 minutes before needing to change position; would need to walk around every 10 minutes for 5 minutes; and, would need the opportunity to shift at will from sitting or standing/walking.  (Tr. 908.)  She indicated Taynor could occasionally twist, stoop (bend), crouch, and climb stairs, but never climb ladders.  *Id.*  Dr. Lewis concluded Taynor's reaching (including overhead) and pushing/pulling were affected by her impairment.  *Id.*  Finally, Dr. Lewis opined Taynor's impairments or treatment would cause her to miss work about once a month.  (Tr. 909.)  Dr. Lewis indicated these limitations applied since Taynor's back injury in November 2005.  *Id.*

### *Hearing Testimony*

During the November 15, 2011 hearing, Taynor testified as follows:

- She has not worked since August 17, 2008.  Prior to that date, she worked as a nurse's aide and as a records clerk for an insurance company.  She stocked shelves for Value City for eight or nine years.  She also directed traffic at utility work sites for about a year.  (Tr. 38-43.)

- Her lower back pain keeps her from working. The pain is constant.  It is a

9

stabbing, aching pain that radiates down both of her legs.  There are "typical days" where the pain is moderate.  However, depending on the weather, it may be severe.  (Tr. 50-51.)

• She has had three or four courses of steroid injections for her back pain.  They "helped for awhile, but they don't do anything anymore."  (Tr. 51.)  Her doctor offered her a spinal cord stimulator, but she declined because she did not think she could stand it.  She has consulted with a surgeon about back surgery twice, but was told she was not a good candidate.  (Tr. 51-52.)

• She also experiences pain in her right arm and shoulder.  She has a torn rotator cuff that makes it difficult for her to use her right arm.  The pain is constant and runs from her shoulder down to her fingers.  She has numbness and tingling in her fingers, making it difficult to hold things.  The pain is "way over a ten" and effects everything she does.  (Tr. 53.)

• She had surgery on her right shoulder in June 2009.  It helped but "it seemed like there was still something wrong."  (Tr. 54.)  She continued to have a lot of pain.  She did home exercises at the advice of her doctor, but they did not help.  She had another MRI that showed tears.  She was in the process of scheduling another surgery at the time of the hearing.  (Tr. 53-54.)

• She takes Lyrica, Zanaflex, Vicodin, Zipsor, and morphine for her pain.  They help "to a point," but make her tired and "spacey."  (Tr. 52-53.)

• She is able to bathe and dress herself.  She prepares meals "to a point."  She does a little bit of vacuuming, mopping, and straightening up.  Typically, she will mop for 15 to 20 minutes; sit down for one to two hours; and, then mop for another 15 to 20 minutes.  She can wash dishes for about 15 to 30 minutes.  (Tr. 44-46, 60-61.)

• She goes to the grocery store at least once/week.  Her son or daughter often go with her, as she has trouble lifting things and remembering what she needs.  She occasionally shops for clothes and eats in restaurants.  She does not go to the movies, ball games, or concerts.  She does not read, garden, play cards, or play board games.  She does not attend church or any clubs.  She drives, but has not traveled more than fifty miles from her home since August 2008.  (Tr. 48-49, 58, 61-62.)

• Her children and grandchildren come to see her, and she talks to her mother every day on the phone for about half an hour.  She babysits for her two year old granddaughter for two to three hours every three to four days.  She has been babysitting for her ever since she was born.  (Tr. 46-48.)

- She tries to go outside and walk a little bit each day.  If she walks for more than 30 to 45 minutes, she gets "a lot of pain" in her back, legs, and arm, and "can't function."  (Tr. 58.)  When she is sitting, she needs to change position every 15 to 30 minutes.  (Tr. 58-59.)

- She likes to go fishing and camping.  She went fishing recently with her family, but only went to the picnic and did not actually fish.  She also went camping for a couple days and slept in a camper.  (Tr. 60.)

The VE testified Taynor had past relevant work as a records clerk (light, SVP 4); nurse's aide (heavy, SVP 4); hand packager (medium, SVP 2); flagger (light, SVP 2); and, stocker (medium-heavy, SVP 4).  (Tr. 64-65.)   As relevant to the instant case, the ALJ posed the following hypothetical:

> [P]lease assume the individual can lift and/or carry 20 pounds occasionally, ten pounds frequently.  She can stand and/or walk for 30 minutes at a time for a total of four hours in an eight-hour workday.  She can sit for two hours at a time for a total of at least six hours in an eight-hour workday.  She can occasionally use her lower extremities for pushing and/or pulling as in the operation of foot controls.  She can occasionally use her right upper extremity for pushing and/or pulling as in the operation of hand controls.  She has no restrictions on the use of her left upper extremity for pushing and/or pulling so long as it's consistent with the above weight restrictions. She can occasionally climb ramps and stairs.  She can never climb ladders, ropes, or scaffolds.  She can occasionally stoop, kneel, crouch, and crawl.  She can frequently reach in all directions with both upper extremities, except that she can never reach overhead with her right upper extremity.  She can frequently finger and handle with her right upper extremity.  She has no restrictions in fingering or handling with her left upper extremity.  She needs to avoid even moderate exposure to extreme cold. She can not use her right upper extremity to operate hand-held vibratory tools.  She needs to avoid concentrated exposure to respiratory irritants such as fumes, odors, dust, gasses, poor ventilation, et cetera.  She cannot work around dangerous machinery or at unprotected heights.  She is limited to simple, routine, repetitive tasks involving only simple work-related decisions.  And, in general, relatively few workplace changes.  She is limited to occasional interaction with supervisors. She is limited to superficial interactions with coworkers and the general public. She can not interact with others in situations involving substantial negotiation, persuasion, or conflict resolution. . . . Based on hypothetical number two, could such an individual perform any of the past work to which you testified here today?

(Tr. 68-69.)  The VE testified such a hypothetical individual would not be able to perform

11

Taynor's past relevant work, but would be able to perform other jobs including that of inspector (sedentary, unskilled, SVP 2); ticket checker (sedentary, unskilled, SVP 2); and, addresser (sedentary, unskilled, SVP 2).  (Tr. 69-70.)  The ALJ then asked whether the VE's answer "would be the same if the individual had a marginal education instead of a limited?"  (Tr. 70.)  The VE testified that his answer would be the same.  (Tr. 70.)

The ALJ then asked another hypothetical that was the same as the one set forth above, "except the individual can lift and/or carry ten pounds occasionally and less than ten pounds frequently . . . [and] can stand and/or walk for 30 minutes at a time for a total of two hours in an eight-hour workday."  (Tr. 70.)  The VE testified such an individual would not be able to perform Taynor's past relevant work, but would be able to perform the previously identified inspector, ticket checker, and addresser jobs.  (Tr. 70.)

The ALJ then asked the VE generally to assess the effect of an individual being off task 20% of the workday.  (Tr. 71.)  The VE testified there would be no jobs for an individual with such a limitation.  (Tr. 71.)  The ALJ asked regarding "the effect of an individual missing three days of work per month."  (Tr. 71.)  The VE testified "it would affect maintainability to the point where there would be no jobs available."  (Tr. 71.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a

12

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[3]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Taynor was insured on her alleged disability onset date, August 17, 2008, and remained insured through the date of the ALJ's decision, December 9, 2011. (Tr. 14.) Therefore, in order to be entitled to POD and DIB, Taynor must establish a continuous twelve month period of disability commencing between those dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. Summary of Commissioner's Decision

The ALJ found Taynor established medically determinable, severe impairments, due to degenerative disc disease and osteoarthritis of the lumbosacral spine; status post right rotator cuff tear on December 7, 2008, status post repair on June 5, 2009; full thickness tear of the mid and posterior supraspinatus tendon of the right shoulder with approximately 13 mm retraction,

---

[3] The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

per MRI on October 20, 2011; mild right shoulder acromioclavicular joint arthrosis, per MRI on

October 20, 2011; hypertension; obesity; history of asthma; chronic obstructive pulmonary

disorder; diverticulosis with a history of diverticulitis in March 2008; gastroesophageal reflux

disease; mitral valve prolapsed; status post hysterectomy in 1991; history of kidney stones;

major depressive disorder; and, generalized anxiety disorder; however, her impairments, either

singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P,

App. 1.  (Tr. 16-18.)  Taynor was found incapable of performing her past work activities, but

was determined to have a Residual Functional Capacity ("RFC") for a limited range of light

work.  (Tr. 18-24.)  The ALJ then used the Medical Vocational Guidelines ("the grid") as a

framework and VE testimony to determine that Taynor was not disabled.  (Tr. 24-25.)

### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the

record to support the ALJ's findings of fact and whether the correct legal standards were applied.

*See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed

if the administrative law judge's findings and inferences are reasonably drawn from the record or

supported by substantial evidence, even if that evidence could support a contrary decision.");

*Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been

defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v.*

*Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and*

*Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists

in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.");

15

*McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

### *Treating Physicians Williams and Lewis*

Taynor argues the ALJ erred when he failed to accord controlling weight to the opinions of treating physicians Williams and Lewis.  She maintains that, to the extent the ALJ found Dr. Williams' opinions to be unclear or ambiguous, he had a duty to recontact Dr. Williams to seek clarification.  Taynor further argues the ALJ failed to provide good reasons for rejecting many of the limitations common to both Dr. Williams' August 2011 and October 2011 opinions.  She also objects to the ALJ's reliance on Taynor apparently demonstrating a greater sitting ability on the date of her hearing than as provided in Dr. Williams' October 2011 opinion.  With respect to Dr. Lewis, Taynor argues the ALJ failed to identify Dr. Lewis as a treating source; did not recognize her specialization in pain management medicine; and, failed to clearly articulate the weight he assigned to her opinion.  She also maintains the ALJ erred in contrasting an isolated remark in Dr. Lewis' September 2011 treatment notes with the November 2011 Physical RFC Assessment.

The Commissioner argues the ALJ's decision to accord little weight to Dr. Williams' and Dr. Lewis' opinions is supported by substantial evidence.  She maintains the ALJ properly relied on the fact that Dr. Williams and Dr. Lewis each offered multiple opinions close in time that, without explanation, escalated the degree of Taynor's functional limitations.  The Commissioner further asserts the ALJ did not err in noting Taynor's apparent ability to sit for over two hours

16

cumulatively on the day of the hearing.

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[4]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). The purpose of this requirement is two-fold.

---

[4] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.

In some circumstances, however, a violation of the "good reasons" rule may be considered "harmless error."  The Sixth Circuit has found these circumstances present where (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d) - the provision of the procedural safeguard of reasons - even though she has not complied with the terms of the regulation." *Wilson*, 378 F.3d at 547.  *See also Cole v. Astrue,* 661 F.3d 931, 940 (6th Cir. 2011); *Nelson v. Comm'r of Soc. Sec*., 195 Fed. Appx. 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. Appx. 456, 464 (6th Cir. 2005).  In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments. *See*

18

*Nelson*, 195 Fed. Appx. at 470-471 (6th Cir. 2006); *Hall*, 148 Fed. Appx. at 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. 2010).   In other words, "[i]f the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Friend*, 375 Fed. Appx. at 551.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.*  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855;  *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Here, the ALJ thoroughly recounted and analyzed the medical evidence regarding Taynor's lower back pain and right shoulder complications.  (Tr. 19-22.)  He then discussed the

19

opinions of Dr. Williams and Dr. Lewis:

> As for the opinion evidence, I give little weight to the opinions of treating physician Dr. Scott D. Williams, M.D.  Dr. Williams gave a series of opinions that escalated in terms of the degree of functional restriction. (7F4; 31F3; 33F3).  For example, in his opinion dated August 5, 2011, Dr. Williams stated that the claimant was able to stand and or walk for four hours and sit for six hours, both during an eight hour workday. (31F3).  Yet only two months later, Dr. Williams stated that the claimant could stand and or walk for less than two hours, and sit for only two hours, each during an eight-hour workday. (33F3).  Dr. Williams did not explain why he believes that the claimant's condition had deteriorated so significantly over only a two-month period.  Furthermore, the objective evidence documents no such worsening in the claimant's condition, specifically noting the lack of change in the MRIs of the claimant's lumbosacral spine over a multi-year period, let alone only two months.  Furthermore, Dr. Williams' opinion is not consistent with the claimant's functional levels on the day of the hearing, because the claimant admitted to sitting through a twenty five to thirty five minute drive to the hearing, and then the one hour and fifteen minute hearing.  Presumably, the claimant was going to sit on the way home as well, putting her total time in the sitting position for the day well over two hours.  Accordingly, I do not rely on the opinions of Dr. Williams despite his treating relationship with the claimant because the substantial weight of the medical evidence does not support his assessments in any fashion.

> Much of the same analysis applies to the opinions of Dr. Jamesetta Lewis, D.O., who stated that the claimant's pain levels did not interfere with her general activity, mood, walking ability, ability to work, relations with other people, sleep patterns, and overall enjoyment of life (35F2).  These statements from Dr. Lewis on September 21, 2011 are in stark contrast to her highly restrictive residual functional capacity form dated again only two months later, on November 7, 2011 (37F1-3).  As with Dr. Williams' assessments, Dr. Lewis fails to explain why she believed the claimant was generally a healthy individual as of September 2011 but had become borderline vegetative by November of that same year.  With no objective evidence to support such a worsening, it is likely that Dr. Lewis' subsequent opinion was a reflection of the claimant's own complaints.

(Tr. 22-23.)  The ALJ formulated the RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the following residual functional capacity.  She can lift and or carry twenty pounds occasionally and ten pounds frequently.  She can stand and or walk for thirty minutes at a time, for a total of four hours in an eight-hour workday.  She can sit for two hours at a time, for a total of at least six hours in an eight-hour workday.  She can occasionally use her lower extremities for pushing and or pulling, as in

20

the operation of foot controls.  She can occasionally use her right upper extremity
for pushing and or pulling, as in the operation of hand controls. She has no
restrictions on the use of her left upper extremity for pushing and or pulling,
consistent with the above weight restrictions.  She can occasionally climb ramps
and stairs.  She can never climb ladders, ropes, or scaffolds.  She can occasionally
stoop, kneel, crouch, and crawl.  She can frequently reach in all directions with
both upper extremities, except that she can never reach overhead with her right
upper extremity.  She can frequently finger and handle with her right upper
extremity.  She has no restrictions in terms of fingering and handling with the left
upper extremity.  She needs to avoid even moderate exposure to extreme cold.
She cannot use her right upper extremity to operate handheld vibratory tools.  She
needs to avoid concentrated exposure to respiratory irritants such as fumes, odors,
dusts, gases and poor ventilation. She cannot work around dangerous moving
machinery or at unprotected heights.  She is limited to simple, routine, repetitive
tasks, involving only simple work-related decisions, and in general relatively few
workplace changes.  She is limited to occasional interactions with supervisors.
She is limited to superficial interactions with coworkers and the general public.
She cannot interact with others in situations involving substantial negotiation,
persuasion, or conflict resolution.

(Tr. 18-19.)

### 1.  Dr. Williams

As noted above, Dr. Williams offered separate opinions regarding Taynor's functional

limitations in August 2011 and October 2011.  In several respects, Dr. Williams' October 2011

opinion was noticeably more restrictive than his previous opinion.  In particular, in his October

2011 opinion, Dr. Williams reduced Taynor's ability to sit to two hours a day and her ability to

stand/walk to less than two hours/day each (from six and four hours, respectively).  (Compare

Tr. 834 with Tr. 838.)  In addition, his October 2011 opinion articulated more restrictive shifting

requirements with respect to Taynor's standing, walking and sitting abilities, and concluded she

would miss more than four days of work per month due to her impairments and/or treatment.

(Tr. 838-840.)

The Court first finds the ALJ did not err in rejecting Dr. Williams' opinions with respect to

21

those limitations regarding which he offered a more restrictive assessment in October 2011.  As the ALJ correctly noted, although the August and October 2011 opinions were offered only two months apart, Dr. Williams did not offer any explanation as to why he believed Taynor was significantly more restricted in the respects noted above.  The ALJ expressly observed that "the objective evidence documents no such worsening in [Taynor's] condition," citing the "lack of change in the MRIs of [her] lumbosacral spine over a multi-year period, let alone two months." (Tr. 22.)  Taynor does not challenge this finding, nor does she direct this Court's attention to any treatment notes or other medical evidence suggesting her back condition deteriorated during this two month time period.  In light of the above, the Court finds the ALJ provided a "good reason" for rejecting Dr. Williams' opinions of more restrictive limitations; i.e. the lack of objective medical evidence to support a significant deterioration in Taynor's condition between his two opinions.[5]  *See Poe v. Comm'r of Soc. Sec.*, 2009 WL 2514058 at * 7 (6th Cir. Aug. 18, 2009) (finding ALJ properly rejected treating physician opinion where "Poe presented no other objective medical evidence to explain how or why, in Dr. Boyd's opinion, Poe was not a candidate for disability in July 2003, but degenerated to the point of being unable to perform sedentary work by August 2006").

Taynor nevertheless argues that "[t]o the extent the discrepancy between Dr. Williams' divergent opinions respecting [her] standing, walking and sitting abilities warranted any reduction in the weight assigned to these limitations, there existed no such divergence" with regard to Dr. Williams' proposed lifting, bending, pushing/pulling, and reaching/handling

---

[5] The Court further notes that the RFC, in fact, largely incorporates the standing, walking and sitting limitations proposed in Dr. Williams' August 2011 opinion.  (Compare Tr. 18 with Tr. 834.)

22

restrictions.  (Doc. No. 18 at 15-16.)  Taynor maintains remand is warranted because the ALJ

failed to provide good reasons for failing to incorporate into the RFC those limitations regarding

which Dr. Williams' two opinions remained consistent.

The Court finds that, although the ALJ could have more clearly articulated his analysis of

Dr. Williams' opinions regarding the specific functional limitations that remained consistent in

both the August and October 2011 opinions, his failure to do so constitutes harmless error.  As

noted above, an ALJ's failure to articulate "good reasons" for rejecting a treating physician

opinion may constitute harmless error where "the Commissioner has met the goal of § 1527(d) -

the provision of the procedural safeguard of reasons - even though she has not complied with the

terms of the regulation."  *Wilson*, 378 F.3d at 547.  *See also Bowen v. Comm'r of Soc. Sec.,* 478

F.3d 742, 747 (6th Cir. 2007); *Nelson,* 195 Fed. Appx. at 470-471; *Hall,* 148 Fed. Appx. at 464.

The Sixth Circuit has elaborated on this exception in a series of cases:

> Two recent cases interpreting this harmless-error exception help to outline its
> contours. One is *Hall v. Comm'r of Soc. Sec*., 148 Fed.Appx. 456, 461–62 (6th
> Cir. 2005), where this court considered the Commissioner's argument that the
> ALJ's failure to directly address the conclusions of a treating physician amounted
> to harmless error.  Hall involved a claimant who asserted total disability based on
> both physical and psychological impairments. *Id*. at 458. The ALJ addressed the
> opinion of Hall's treating physician in the course of discussing Hall's
> psychological impairment, but failed to address the physician's findings with
> regard to Hall's physical limitations. *Id*. at 463.  Two particular aspects of the
> ALJ's decision troubled the court.  First, the court emphasized that the ALJ's
> decision was inconsistent in that it accepted the treating physician's opinion in
> some respects but rejected it in others without explanation. *Id*. at 465.  The court
> also noted that, although the ALJ addressed other medical opinions related to
> Hall's physical limitations, none of them supported the specific RFC that the ALJ
> ultimately adopted. *Id.* at 465–66.  Because the court was unable to discern the
> ALJ's reasons for the weight that he gave to the opinion of Hall's treating
> physician, the § 1527(d)(2) violation necessitated a remand.  *Id.* at 467.
>
> In contrast, this court in *Nelson v. Comm'r of Soc. Sec*., 195 Fed.Appx. 462, 472
> (6th Cir.2006) (*per curiam*), held that the ALJ's failure to abide by the letter of §

1527(d)(2) amounted to harmless error.  The court determined that the ALJ's analysis satisfied the goals of § 1527(d)(2) by "indirectly attacking" the treating physicians' opinions.  *Id* at 471.  In *Nelson*, the ALJ had briefly referred to the opinions of two of the claimant's treating physicians, but had not fully explained why he accorded them little weight as required by § 1527(d)(2).  *Id* at 470.  Nevertheless, the court held that those brief references, which arose in the context of discussing a multitude of contrary medical evidence, met the regulatory goal of addressing the opinions of the treating sources as well as their inconsistency with the record as a whole.  *Id*. at 472.

*Bowen*, 478 F.3d at 747-748.  More recently, in *Bowen*, the Sixth Circuit held the harmless error exception did not apply where the ALJ failed to acknowledge the opinion of claimant's treating physician at all, noting that "[t]his case is unlike *Nelson* because there is not even a passing reference to Dr. Holean's opinion in the ALJ's decision that allows us to infer that the ALJ intended to indirectly attack it."  *Id*. at 749.

The Court finds the instant case is more akin to *Nelson*, than to either *Hall* or *Bowen*.  Here, the ALJ acknowledged Dr. Williams' opinions and explained he was according them "little weight."  (Tr. 22.)  Moreover, like *Nelson*, the ALJ's discussion of the medical evidence makes clear that he found Dr. Williams' proposed lifting, bending, pushing/pulling, and reaching/handling restrictions to be inconsistent with the other record evidence as a whole.  Indeed, rather than simply reciting Taynor's diagnoses and treatment history, the ALJ analyzed the medical evidence regarding Taynor's lower back and right shoulder pain and explained how it supported his ultimate RFC determination.  For example, after discussing Taynor's September 2008 MRI, the ALJ noted "there exist questions as to whether the claimant's condition has worsened as of [the onset date] August 17, 2008 given that the MRI findings have not changed over this period," further observing that "the findings themselves of only possible slight L3 nerve root compressions and mild disc bulging at L4-5 are not particularly indicative of the extreme

24

lower back pain that the claimant has alleged."  (Tr. 19.)  The ALJ also found that the "medical

signs concerning the claimant's lower back pain are largely equivocal," citing the fact that (1)

treatment notes indicated Taynor repeatedly presented with a stable gait and full muscle strength

in her lower extremities; and, (2) the January 2009 EMG showed no evidence of lumbosacral

radiculopathy.  (Tr. 19-20.)  Similarly, with regard to Taynor's right shoulder, the ALJ discussed

the objective medical evidence regarding this condition and found as follows:

> Thus, the record is somewhat equivocal as to the extent of the impairment of the
> claimant's shoulder.  On the one hand, there are medical signs and reports from
> the claimant herself that the June 2009 surgery greatly improved her symptoms.
> On the other, the October 20, 2011 MRI shows significant pathology, despite no
> evidence to suggest what caused this worsening.  Giving the claimant some
> benefit of the doubt concerning this discrepancy, I find that the symptoms of her
> right shoulder impairment limit her to occasional pushing or pulling with the right
> upper extremity and that she should never reach overhead with the right upper
> extremity, given the documented full thickness tear to the right supraspinatus
> tendon.  That said, the record documents little complication in the claimant's
> ability to handle and finger with the right upper extremity, thus warranting only a
> restriction to frequent activities with the right upper extremity.

(Tr. 20.)

The ALJ then discussed the opinion evidence, according "some weight" to Dr. Freihofner's

opinion that "the claimant is limited to light work, with no climbing of ladders, ropes, or

scaffolds, occasional bending, stooping, kneeling, and crouching, and the avoidance of all

workplace hazards."  (Tr. 23.)  The ALJ noted that "[w]hile Dr. Freihofner's opinion does not

adequately address the restrictions in the claimant's ability to stand and walk, due to the pain in

her lower back, his opinion is generally consistent with the notion that the claimant can lift and

carry ten pounds frequently and twenty pounds occasionally, despite her physical symptoms."

(Tr. 23.)

In light of the above, the Court finds the ALJ's discussion of the record evidence shows that

25

he found Dr. Williams' proposed lifting, bending, pushing/pulling, and reaching and handling restrictions were inconsistent with the other record evidence. In his analysis of the medical evidence, the ALJ implicitly provided sufficient reasons for not giving Dr. Williams' opinions regarding these functional limitations controlling weight. Moreover, unlike in *Hall* where no other medical opinions supported the RFC determination, the ALJ herein based the RFC's lifting, bending, pushing/pulling, and reaching/handling restrictions on other opinion evidence in the record. Specifically, the RFC's (1) lifting restriction is consistent with Dr. Freihofner's opinion; (2) bending restriction is consistent with both Dr. Lewis' November 2011 opinion and Dr. Freihofner's opinion; and (3) pushing/pulling, reaching, and handling restrictions are arguably consistent with (or more restrictive than) Dr. Lewis' November 2011 opinion.[6] Taynor does not identify any additional bending, pushing/pulling, reaching or handling limitations that she believes should have been incorporated into the RFC.

Thus, reading the decision as a whole, the Court finds the ALJ's analysis of the other medical and opinion evidence of record indirectly addressed the supportability of Dr. Williams' opinions. Thus, the ALJ "met the goal of § 1527(d)(2) – the provision of the procedural safeguard of reasons– even though []he has not complied with the terms of the regulation." *Hall*, 148 Fed. Appx. at 462. Accordingly, the Court finds the ALJ's failure to clearly articulate why he rejected those functional limitations common to both Dr. Williams' August 2011 and October

---

[6] In her November 2011 opinion, Dr. Lewis states that Taynor's ability to handle is not affected by her impairments. She further opines that Taynor's abilities to push/pull, and reach are "affected by" her impairments, stating that she has limited range of motion with her right shoulder. She does not, however, more specifically clarify the extent of this limitation. (Tr. 907-909.) Thus, the RFC is arguably consistent with Dr. Lewis' November 2011 opinion regarding these specific functional limitations.

2011 opinions constitutes harmless error.[7]

The Court also rejects Taynor's argument that the ALJ had a duty to recontact Dr. Williams pursuant to 29 CFR 404.1512(e) and Social Security Ruling ("SSR") 96-5p, 1996 WL 374183 (July 2, 1996). SSR 96-5p provides, in pertinent part:

> Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

SSR 96-5p, 1996 WL 374183 at * 6. The Sixth Circuit has held that this Ruling identifies two conditions that must both be met to trigger the duty to recontact: "'the evidence does not support a treating source's opinion . . . *and* the adjudicator cannot ascertain the basis of the opinion from the record.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 273 (6th Cir. 2010) (quoting SSR 98-5p at * 6) (emphasis added). *See also Poe*, 2009 WL 2514058 at * 7, fn 3 (stating that "an ALJ is required to recontact a treating physician only when the information received is inadequate to reach a determination on claimant's disability status"); *Campbell v. Comm'r of Soc. Sec.*, 2013 WL 1908145 at * 8 (N.D. Ohio May 7, 2013).

The Court finds the ALJ did not have a duty to recontact Dr. Williams. In his October 2011 opinion and in response to the question "what medical findings support the limitations described above, Dr. Williams expressly identifies Taynor's "L2-L3 disc herniation [and] L4-L5

---

[7] In both his August and October 2011 opinions, Dr. Williams concluded Taynor was capable of lifting no more than 10 pounds both occasionally and frequently. (Tr. 834, 838-840.) The Court notes that, during the hearing, the VE confirmed that even if Taynor were limited to lifting and/or carrying 10 pounds occasionally and less than 10 pounds frequently, she would not have been precluded from performing the occupations of inspector, ticket taker, and addresser. (Tr. 70.)

disc bulging." (Tr. 839.) As discussed above, the ALJ analyzed this issue and determined the objective medical evidence regarding Taynor's lower back pain (including the 2008 MRI identifying disc herniation and bulging) "are not particularly indicative of the extreme lower back pain that the claimant has alleged." (Tr. 19.) Thus, the basis of Dr. Williams' opinion was not unclear. Rather, the ALJ determined Dr. Williams' opinions were unpersuasive, not because he could not ascertain the bases for them, but because they were not corroborated by the objective medical evidence. It follows then that the ALJ's duty to recontact Dr. Williams was not triggered. *See Ferguson*, 628 F.3d at 274.

Accordingly, and for all the reasons set forth above, the Court finds the ALJ's analysis of Dr. Williams' opinions is supported by substantial evidence.[8]

### 2. Dr. Lewis

The Court also rejects Taynor's arguments with respect to the ALJ's analysis of Dr. Lewis. As an initial matter, the Court finds Taynor's argument that the ALJ failed to identify Dr. Lewis as a treating physician or identify the weight he accorded her opinion, to be without merit. Reviewing the ALJ's discussion of Dr. Lewis' opinion in context, the Court finds that, by implication, the ALJ recognized Dr. Lewis as one of Taynor's treating physicians and accorded her opinion only little weight.

Taynor also argues the ALJ improperly construed a statement in Dr. Lewis' September 21, 2011 treatment notes to be Dr. Lewis' medical opinion regarding Taynor's overall functional limitations. Specifically, Taynor maintains the September 2011 treatment note details a visit

---

[8] In light of the above, the Court need not reach Taynor's argument that the ALJ erred when he based his rejection of Dr. Williams' opinions, in part, on the grounds that Taynor demonstrated a greater sitting ability on the date of the hearing.

regarding her shoulder pain only; does not "appear to speak at all to Plaintiff's lumbar pain or other medical conditions;" and, "would not appear to be" reflective of Dr. Lewis' opinion as to Taynor's "overall functional abilities." (Doc. No. 18 at 19.) Taynor further asserts that "the passage cited by the ALJ did not represent Dr. Lewis' opinion of Plaintiff's abilities and limitations at all, but represented merely Plaintiff's subjective report of her shoulder limitations or improvement since her injection." *Id.*

In her September 21, 2011 treatment notes, Dr. Lewis stated that "[i]n terms of [Taynor's] functionality assessment worksheet, the pain does not interfere with her general activity, mood, walking ability, normal work, relations with other people, sleep patterns, and overall enjoyment of life." (Tr. 889.) In rejecting Dr. Lewis' opinions, the ALJ found this statement to be "in stark contrast to [Dr. Lewis'] highly restrictive residual functional capacity form dated again only two months later, on November 7, 2011," noting "Dr. Lewis fails to explain why she believed the claimant was generally a healthy individual as of September 2011 but had become borderline vegetative by November of that same year." (Tr. 23.) Remarking there was no objective evidence to support such worsening, the ALJ concluded that "Dr. Lewis' subsequent opinion was a reflection of the claimant's own complaints," which he found to be lacking in credibility. (Tr. 23.)

The Court acknowledges the meaning of Dr. Lewis' statement is somewhat unclear. Dr. Lewis' treatment note does not attach a "functionality assessment worksheet" and the parties do not direct the Court's attention to such a document dated from September 2011. In the absence of any evidence suggesting otherwise, the Court finds the ALJ did not unreasonably construe this statement as the opinion of Dr. Lewis regarding the impact of Taynor's pain on her general

activity level, walking, "normal work," and "overall enjoyment of life."  Indeed, the Court has found that, under certain circumstances, treating physician opinions set forth in treatment notes may constitute "medical opinions" for purposes of the regulations.  *See Huntington v. Colvin,* 2014 WL 346288 at * 9-10 (N.D. Ohio Jan. 30, 2014) (citing *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (finding treating physician's treatment notes constituted a "medical opinion" for purposes of §§ 404.1527(a)(2) and 416.927(a)(2))).

Moreover, the Court is unpersuaded by Taynor's argument that this statement in Dr. Lewis' September 2011 treatment note relates only to her evaluation of Taynor's shoulder pain. On its face, the statement at issue is not limited in scope to Taynor's right shoulder.  To the contrary, a reasonable construction of this statement is that it relates broadly to the impact of Taynor's overall pain levels on her functional abilities.  Moreover, although Taynor presented to Dr. Lewis on September 21, 2011 for her right shoulder pain, the treatment notes indicate Dr. Lewis conducted a full musculoskeletal examination of Taynor on that date, including an examination of her gait, lower extremities, and lumbar musculature.  (Tr. 889-890.) Accordingly, the Court finds it was not unreasonable for the ALJ to construe the statement at issue in Dr. Lewis' September 21, 2011 treatment notes as an opinion regarding Taynor's overall functional abilities on that date.

Having so found, the Court further finds the ALJ did not err in rejecting Dr. Lewis' opinions.  Unlike Dr. Williams' two opinions which contained some common functional limitations, the Court finds Dr. Lewis' November 2011 opinion is fairly characterized as entirely inconsistent with her September 2011 opinion.  As such, and as discussed in more detail *supra*, the Court finds the ALJ provided a "good reason" for rejecting Dr. Lewis' opinions; i.e., the lack

of objective medical evidence to support a significant deterioration in Taynor's condition

between Dr. Lewis' two opinions.  Taynor does not challenge the ALJ's specific finding that the

objective medical evidence fails to document a worsening in Taynor's back condition, nor does

she direct this Court's attention to any treatment notes or other medical evidence suggesting this

condition did, in fact, significantly deteriorate between September and October 2011.  Moreover,

although Taynor underwent an MRI of her shoulder in October 2011 which showed a full

thickness tear, the ALJ acknowledged this evidence and, accordingly, limited Taynor to

occasional pushing/pulling and no overhead reaching with the right upper extremity.  (Tr. 20.)

As noted *supra*, Taynor does not identify any additional pushing/pulling, reaching or handling

limitations that she believes should have been incorporated into the RFC.  Thus, the Court finds

the ALJ provided "good reasons" for rejecting Dr. Lewis' opinions and, further, that this

rejection is supported by substantial evidence.

    However, even assuming the ALJ improperly construed Dr. Lewis' September 2011

treatment notes as a "medical opinion" regarding Taynor's overall functional limitations, the

Court finds any resulting failure to provide "good reasons" for rejecting Dr. Lewis' opinions

constitutes "harmless error."  Although the ALJ purported to reject Dr. Lewis' opinions in total,

the Court notes the RFC is, in fact, arguably consistent with Dr. Lewis' November 2011 opinion

regarding Taynor's abilities to stoop (bend); climb stairs and ladders; push/pull; reach; and,

handle.  The Sixth Circuit has held that a violation of the "good reasons" rule may be considered

"harmless error" where the "Commissioner adopts the opinion of the treating source or makes

findings consistent with the opinion."  *See Wilson*, 378 F.3d at 547.   Thus, to the extent the RFC

is consistent with Dr. Lewis' November 2011 opinion, the ALJ's failure to articulate "good

reasons" in evaluating this opinion is "harmless error."   Moreover, to the extent the RFC is not consistent with Dr. Lewis' November 2011 opinion, the Court finds the ALJ's failure to articulate "good reasons" constitutes "harmless error" for the same reason set forth in connection with the ALJ's rejection of Dr. Williams' opinions; i.e. the ALJ's analysis of the other medical and opinion evidence of record indirectly addressed the supportability of Dr. Lewis' November 2011 opinion. *See Nelson*, 195 Fed. Appx. at 470-471.

Accordingly, and for all the reasons set forth above, the Court finds the ALJ's analysis of Dr. Williams' opinions is supported by substantial evidence.

### *Credibility*

Taynor argues the ALJ improperly evaluated her credibility.  She maintains the ALJ substituted his own opinion regarding the objective medical evidence for that of her physicians; improperly relied on his observations of her sitting ability at the hearing; and, mischaracterized the evidence regarding her fishing and camping activities.  (Doc. No. 19 at 22-24.)

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment.  Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms." SSR 96-7p.  Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objective medical evidence confirms the

32

alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *See Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994).

 If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record.  *Id.* Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight."  SSR 96-7p, Purpose section; *see also Felisky,* 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

 To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* SSR 96–7p, Purpose.  Beyond medical evidence, there are seven factors that the ALJ should consider.[9]  The ALJ need not analyze all seven factors, but should show that he

---

[9] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other

considered the relevant evidence.  *See Cross,* 373 F.Supp.2d at 733; *Masch v. Barnhart*, 406

F.Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ found that, while Taynor's impairments could reasonably be expected to

cause her pain, Taynor's statements concerning the intensity, persistence, and limiting effects of

her symptoms were not credible to the extent they were inconsistent with the RFC.  (Tr. 19.)  In

support of this conclusion, the ALJ discussed the results of the September 2008 MRI of Taynor's

back and observed as follows:

> Furthermore, the findings themselves of only possible slight L3 nerve root
> compression and mild disc bulging at L4-5 are not particularly indicative of the
> extreme lower back pain that the claimant has alleged.  I note that the referenced
> MRI reports and a lumbosacral myelogram dated January 6, 2010 found no
> central canal stenosis or any marked levels of neural foraminal narrowing, being
> more significant findings that might better support the claimant's allegations (see
> 34F33).  Furthermore, the medical signs concerning the claimant's lower back
> pain are largely equivocal, as the claimant often has presented with negative
> straight leg raise testing, which if present would be a sign closely associated with
> neurological compromise in the lumbosacral spine (see e.g., 4F101).  I also note
> that the EMG study of the claimant's lower extremities dated January 2, 2009
> found no evidence of lumbosacral radiculopathy, raising significant doubts as to
> the claimant's allegations of such.  In fact, the claimant's primary allegation
> throughout the record has been complications in her lower extremities due to
> radiculopathy, yet these EMG findings suggest that there is no actual pathology to
> cause such symptoms.  (4F126).  Furthermore, the claimant has repeatedly
> presented with a stable gait and full muscle strength in her lower extremities,
> again being evidence that appears inconsistent with her allegations of marked
> restrictions in her ability to stand and or walk for prolonged periods (see e.g. 4F6,
> 101).
>
> While it is true that physical exams have repeatedly revealed tenderness
> throughout the claimant's lumbosacral spine, such signs suggest little more than
> what the MRI findings confirmed, that the claimant does in fact have significant
> degenerative changes in that region (see 4F101).  Compared though to the EMG

---

than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any
other factors concerning the individual's functional limitations and restrictions due to pain or
other symptoms. See SSR 96–7p, Introduction.

> findings of no radiculopathy, the myelogram findings of no spinal stenosis, and
> the MRI findings of only some slight L3 nerve root impingement, these signs of
> tenderness in the lower back have relatively little persuasive weight in this matter.
> Ultimately, I find that the claimant does experience work-related restrictions as
> the result of her lower back pain.  That said however, these restrictions do not
> warrant a restriction to sedentary work, given the only moderate nature of the
> objective findings.  The claimant does likely experience pain upon prolonged
> standing, walking, or sitting, but again I note that she was able to sit through the
> hour plus hearing with no visible signs of distress.

(Tr. 19-20.)  The ALJ went on to note Taynor's testimony that she has been babysitting for her

granddaughter since November 2008, and that she is currently babysitting three or four days a

week for two to three hours a day.  (Tr. 22.)  The decision also noted Taynor's testimony that she

enjoys walking, fishing, and camping; as well as medical evidence indicating she had been

throwing vines on a fire in her yard in July 2010. ( Tr. 22.)

The Court finds the ALJ did not improperly assess Taynor's credibility.  The ALJ fully

considered the medical evidence and hearing testimony, and found that "the claimant's

allegations are largely inconsistent with what the objective evidence suggests in terms of

functional restriction."  (Tr. 23.)   The ALJ also found Taynor's hearing testimony about her

abilities to babysit her grandchildren, walk each day, fish, and camp to be inconsistent with the

severity of her alleged symptoms.  The Sixth Circuit has repeatedly noted that "[d]iscounting

credibility to a certain degree is appropriate where an ALJ finds contradictions among medical

reports, claimant's testimony, and other evidence." *Cruse v. Comm'r of Soc. Sec*.,, 502 F.3d 532,

543 (6th Cir. 2007) (quoting *Walters v. Comm'r of Soc. Sec.,*, 127 F.3d 525, 531 (6th Cir. 1997).

Here, the ALJ recognized that the objective medical evidence confirms Taynor suffers some

degree of pain as a result of her impairments.  Reading the decision as a whole, the Court finds

the ALJ thoroughly evaluated Taynor's allegations of disabling pain and articulated specific

reasons for rejecting them in accordance with SSR 96–7p.

Moreover, while Taynor argues the ALJ improperly substituted his judgment for that of her treating physicians, the Court disagrees. An ALJ is permitted to evaluate a claimant's statements in relation to all of the relevant evidence, including the objective medical evidence, such as medical signs and laboratory findings. *See* 20 CFR §§ 404.1529(c)(2)(4). Here, the ALJ accurately related the MRI, EMG, and myelogram results, and appropriately characterized the relevant physical examination findings.[10] The Court finds the ALJ did not err in relying, in part, on the contradictions between this evidence and Taynor's allegations in making his credibility determination.

Taynor argues at length that the ALJ erred in questioning her credibility based on her apparent ability to sit over two hours in connection with the hearing. However, even assuming the ALJ erred in relying on this observation, the Court notes this was not the sole basis on which the ALJ based his credibility determination. Rather, in addition to relying on the inconsistency between Taynor's allegations and the medical evidence, the ALJ also relied on Taynor's testimony regarding her babysitting, walking, and camping.

While Taynor urges the Court to find that the reasons given by the ALJ do not demonstrate a lack of credibility, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve

---

[10] Taynor argues the ALJ erroneously found that she "often" had negative straight leg raising. (Doc. No. 19 at 22.) While it is true Taynor sometimes had positive straight leg raising tests (particularly when examined by Dr. Lewis in 2011), she also often had negative straight leg raising tests. As the Commissioner notes, this is particularly the case between 2008 and 2010. (Tr. 277, 281, 293, 306, 309, 313, 321, 329, 337, 341, 345, 349, 353, 357, 521, 676, 692.) Thus, while there may be some evidence to the contrary in the hundreds of pages of medical records before the ALJ, the Court finds that, overall, the ALJ accurately characterized Taynor's physical examination findings.

conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)).  *See also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is *not* the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.")  The ALJ provided sufficiently specific reasons for his credibility determination and supported those reasons with reference to specific evidence in the record.  Taynor's second assignment of error is without merit.

### VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence.  Accordingly, the decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

/s/ Greg White
U.S. Magistrate Judge

Date: June 9, 2014